THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD W. DUDA *et al.*, Defendants-Appellants.

Fourth District    No. 15644

Opinion filed March 20, 1980.

Michael B. Metnick, of Springfield, and David Goldberger and Howard M. Richard, of Katten, Muchin, Gitles, Zavis, Pearl & Galler, both of Chicago, for appellants.

C. Joseph Cavanagh, State's Attorney, of Springfield (Gary J. Anderson and Larry Wechter, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

A demonstration and "smoke-in" on the Illinois Capitol grounds.

Charge: Interference with another's use of State land.

Guilty—2 days in jail.

We reverse: Insufficient evidence.

Duda and his co-defendants (Norris, Kiser, Haynes, and Callahan) were convicted of criminal trespass to State-supported land following a bench trial. The charges arose from an incident which occurred on September 3, 1978, on the grounds of the Illinois State Capitol in Springfield, at what has commonly been referred to as "Springfield's First Annual Fall Harvest Festival and Smoke-in."

Complaints were filed which charged defendants with violating section 21—5(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 21—5(a)), in that they:

> "* * * entered upon land, the grounds of the State House of the State of Illinois, located in Springfield, Sangamon County, Illinois, and remained upon the land after receiving notice from Lance Charlson, a representative of the Secretary of State of the State of Illinois, and thereby interfered with the Illinois Secretary of State's lawful use of such land, to-wit: His legal duty to take charge of and preserve from waste and keep in repair such land, which land is supported in part with State of Illinois funds."

At trial, Gene Graves, director of physical services for the Office of the Secretary of State, detailed the attempts by defendant Duda to obtain permission to hold a demonstration on the capitol grounds. But permission was denied.

Graves then told of the events which occurred several days later, on September 3, 1978. The crowd began assembling at approximately 11:30 a.m. on the capitol grounds and the demonstration remained orderly until 1 p.m., at which time Graves noted a marked change in the crowd's

demeanor. Members of the crowd sat in trees, broke tree branches, and put up signs. At 2 p.m., Graves determined that the demonstration should end at 3 p.m. Graves also stated that regulations concerning demonstrations outside of the Capitol Building were determined on an *ad hoc* basis, not by prior defined policy.

Steve Morehead, a lieutenant with the investigation division of the Secretary of State's office, testified regarding two incidents of a male beating on a replica of the liberty bell with wood and metal objects. At approximately 2:40 to 2:45 p.m., he informed defendant Duda and the others that the protest was to end at 3 p.m. At Morehead's request, defendant Duda. relayed the message to the crowd. The crowd became boisterous after the announcement. Morehead also noted that the grounds were littered with beer bottles and cans, paper sacks, and other debris.

At approximately 3:30 p.m., a crowd control team of 150 officers in riot gear moved in to disperse the demonstrators. (There were 250-300 persons attending the demonstration.) Defendants Duda, Norris, Callahan, and Kiser were arrested after refusing to depart, and the grounds were cleared.

Steadfast in their desire to protest, and undaunted by the actions of the law enforcement personnel, a crowd of 75 to 100 demonstrators returned to the capitol grounds. Again the crowd was dispersed. Defendant Haynes was arrested in the second sweep of the grounds after he refused to depart. Tranquility was finally restored at approximately 5:30 p.m. on this hot September afternoon.

At sentencing, each defendant got two days in the county jail.

Defendants initially claim that the State has not shown guilt beyond a reasonable doubt. After carefully examining all of the evidence presented, we must agree. (And for this reason, we need not address the constitutional questions which have been raised.)

The criminal trespass statute states:

"(a) Whoever enters upon land supported in whole or in part with State funds, or Federal funds administered or granted through State agencies or any building on such land, after receiving, immediately prior to such entry, notice from the State or its representative that such entry is forbidden, or remains upon such land or in such building after receiving notice from the State or its representative to depart, *and who thereby interferes with another person's lawful use or enjoyment of such building or land,* commits a Class A misdemeanor." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 38, par. 21—5(a).

■■ Defendants concede that they entered upon State-supported land

and that they remained upon the land after being given notice to depart. They claim, however, that the State failed to establish an essential element of the offense—*interference with another person's lawful use and enjoyment.* The only examination of this requirement is this court's decision in *People v. Holtzman* (1973), 10 Ill. App. 3d 528, 294 N.E.2d 708. There, the defendant was convicted for refusing to discontinue soliciting signatures on a petition outside of a snack bar at the University of Illinois after being asked to leave by University police officers. This court reversed the conviction, declaring that the State failed to establish any interference with the use and enjoyment of the premises. In so doing, interference was defined as the type of conduct which by its nature tends to hinder, disrupt, or obstruct the orderly function of the official enterprise being carried on in the building or on the land.

The Illinois State Capitol serves a variety of functions, directly and indirectly. It is the seat of State government, the home of the legislature, and houses the offices of the Governor and other assorted State officials. It is also a tourist attraction, a place where citizens can observe their government in action and become instilled with a sense of civic pride and understanding. Finally, it affords a forum and setting for the expression of ideas, either officially or unofficially.

While it would be easy to fathom how a crowd of 250 to 300 demonstrators could hinder, disrupt or obstruct these functions, our review of this record reflects that the State has failed to establish any interference in this case. There was no evidence of robust legislators scurrying through capitol halls or congregating in hearing rooms. There was no evidence of classes of wide-eyed 10-year-olds craning their necks to catch a glimpse of the furious activity. There was no evidence of the young married couple, with toddler in hand, attempting to properly introduce him to the concrete, marble and bronze halls of government.

Exactly what does the evidence tell us? The evidence establishes that a group of protestors held a demonstration outside the State Capitol on September 3, 1978—a Sunday—the Sunday, in fact, of the Labor Day weekend. And the testimony at trial further established that the building was locked due to the holiday.

Did the evidence establish any permanent destruction to the beauty and magnificence of the capitol complex? We hardly think so. Certainly there was litter, but at most this was a temporary eyesore. There was also the striking of the liberty bell. The record is devoid, however, of any evidence as to any adverse effect from the striking on the bell.

Finally, there were broken tree branches. But was the hurt mortal to the trees? Were future generations to be deprived of the shade and beauty of century-old oaks? Again, no. There was no evidence whatever concerning any permanent damage to the trees.

But even if some permanent type of damage were shown, we would still be compelled to the same result for the complaint simply did not sufficiently allege this type of interference. As we have noted, the complaint alleged an interference with the Secretary of State's duty to maintain and preserve the State property. Ill. Rev. Stat. 1977, ch. 124, par. 5(7).

The State asserted in the trial court—and also asserts in this court—that any obstruction of the Secretary of State's duty is sufficient to establish interference with "another person's lawful use or enjoyment * * * ." We cannot agree. Simply stated, we do not feel that this is the type of interference that the legislature had in mind when it drafted the statute. The words "lawful use or enjoyment," given their plain meaning, are clearly not broad enough to encompass the duty to maintain.

It is quite possible that these protestors did in fact violate the statute in question by interfering with another's lawful use or enjoyment. A court of review is, however, limited by the record which is made in the trial court and presented to it. We cannot conjure up facts to fill the void in the evidence presented by the State and consequently we are forced to reverse.

Our final *caveat*. This reversal should in no way be taken as a condonation of the disobedience of orders by law enforcement officials or the violation of marijuana laws. It is conceivable that the State, with the evidence available to it, might have successfully prosecuted these defendants for violating other criminal statutes, such as obstructing a police officer, disorderly conduct, littering, etc. Those were not, however, charged by the prosecution in this case.

Reversed.

GREEN and WEBBER, JJ., concur.